UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

CLINT BARNES,                            :

                    Plaintiff,           :

         - against -                     :       **OPINION**

AMERICAN INTERNATIONAL LIFE              :       08 Civ. 06222 (DC)
ASSURANCE COMPANY OF NEW YORK,
a Member Company of AMERICAN             :
INTERNATIONAL GROUP, INC.,
                                         :
                    Defendant.
                                         :
- - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/4/10
```

**APPEARANCES:**         USCHER, QUIAT, USCHER & RUSSO, P.C.
                         Attorneys for Plaintiff
                              By:  Michael E. Quiat, Esq.
                         433 Hackensack Avenue, Second Floor
                         Hackensack, New Jersey  07601


                         SCHNADER HARRISON SEGAL & LEWIS, LLP
                         Attorneys for Defendant
                              By:  Carl J. Schaerf, Esq.
                                   Allison A. Snyder, Esq.
                         140 Broadway, Suite 3100
                         New York, New York  10005


**CHIN, District Judge**

          On February 8, 2007, thirty-one year old Trudy Barnes

("Ms. Barnes") had elective orthopedic surgery to correct an

abnormal curvature of her spine.  During the surgery, a catheter

was improperly inserted into her chest, puncturing a vein.  She

went into cardiac arrest, and died two days later.

          Ms. Barnes was insured under a group accidental death

and dismemberment insurance policy (the "Policy") issued by

American International Group through its member company,

defendant American International Life Assurance Company of New

York (together, "AIG"), to L-3 Communications Corporation ("L-3"). Ms. Barnes's husband, plaintiff Clint Barnes ("Barnes"), an employee of L-3, had obtained coverage under the Policy for her. He submitted a claim under the Policy for her death.

AIG denied the claim on the basis that the Policy was "an accident only policy and does not cover sickness or disease." Although it was clear that Ms. Barnes had died from medical malpractice, AIG took the position that her death was not accidental and therefore not covered by the Policy.

Barnes brought this case under the Employee Retirement Income Security Act of 1974 ("ERISA"), to challenge the denial of benefits. Before the Court are the parties' cross-motions for summary judgment. As explained more fully below, I conclude as a matter of law that Ms. Barnes's death was the result of an "accident." Her death was not caused by scoliosis or a back problem or any sickness or disease; to the contrary, she died because a catheter was improperly placed into her chest, rupturing a vein and causing internal bleeding and a profusion of fluids into her chest cavity. This was not supposed to happen. Rather, this was an unintentional, unexpected, unusual, and unforeseen event -- an accident. AIG's determination to the contrary must be set aside as arbitrary and capricious. Accordingly, Barnes's motion is granted and AIG's motion is denied. I conclude that Barnes is entitled to benefits under the Policy for the accidental death of his wife.

-2-

## STATEMENT OF THE CASE

### A.   The Facts

Except as otherwise indicated, the facts are not in dispute.

### 1.   The Parties

At all relevant times, Barnes resided in Texas and was employed by L-3 in Texas.  (AIG 081, 103;[1] see Compl. ¶¶ 1, 3). L-3 has its principal place of business in New York.  (Compl. ¶ 4; Answ. ¶ 4).  Defendant is a life insurance company with its principal place of business in New York.  (Compl. ¶ 5; Answ. ¶ 5).

### 2.   The Policy

L-3 provided its employees and their families with various life and accident insurance plans.  (AIG 051).  These plans were summarized in a "Summary Plan Description" (the "SPD") provided to its employees.  (AIG 048-082).  The SPD notes that it describes "the most important features" of the different life and accidental insurance plans, but explains that the "actual provisions" of the insurance plans were set forth in the

---

[1]   References to "AIG __" are to the page numbers of the administrative record, attached to the affidavit of Carl J. Schaerf as Exhibit C.  The Policy is attached to the Schaerf affidavit as Exhibit E and will also be cited by reference to the AIG numbers stamped at the bottom of each page.  References to "Pl. Mem." and "Pl. Opp. Mem." are to, respectively, plaintiff's memorandum of law in support of his summary judgment motion and in opposition to AIG's summary judgment motion.  Similarly, references to "Def. Mem. and "Def. Opp. Mem." are to, respectively, AIG's memorandum of law in support of its summary judgment motion and in opposition to plaintiff's summary judgment motion.

respective insurance policies between L-3 and the applicable insurers.  (AIG 051).

Barnes had the option to select from different types and levels of coverage.  (Pl. 56.1 Statement ¶ 3; Def. 56.1 Response ¶ 3).  He also had the option to choose coverage for his dependent spouse, Ms. Barnes.  (Pl. 56.1 Statement ¶ 4; Def. 56.1 Response ¶ 4).  Barnes elected to obtain coverage for voluntary accidental death and dismemberment insurance, which required him to pay additional premiums.  (Pl. 56.1 Statement ¶¶ 6, 7; Def. 56.1 Response ¶¶ 6, 7).  Barnes also obtained voluntary accidental death and dismemberment ("AD&D") insurance for his wife, with coverage of $148,800.  (Pl. 56.1 Statement ¶ 8; Def. 56.1 Response ¶ 8).  The Policy was placed with L-3 by a New York City broker and was negotiated and delivered to L-3 in New York. (Pl. 56.1 Statement ¶ 2; Def. 56.1 Response ¶ 2).   The Policy provides death benefits as follows:

> Accidental Death Benefit.  If Injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury, [AIG] will pay 100% of the Principal Sum.

(AIG 649).

The Policy defines "Injury" as:

> bodily injury caused by an accident occurring while this Policy is in force as to the person whose injury is the basis of claim and resulting directly and independently of all other causes in a covered loss.

(AIG 647).

-4-

On the cover page, in bold print, the Policy states:

THIS IS AN ACCIDENT ONLY POLICY.   IT DOES NOT
COVER SICKNESS OR DISEASE.

(AIG 645).

The SPD contains a section on voluntary AD&D insurance coverage ("Voluntary AD&D").  (AIG 065-070).  It explains that Voluntary AD&D provides "worldwide protection that applies to accidents on or off the job, at home or away from home."  (AIG 065).  It explains that benefits will be paid to the beneficiary for death or severe injury, in addition to benefits provided by any other coverage.  (Id.).  The SPD does not explicitly state, as does the Policy, that sickness and disease are not covered. (AIG 065-070).

Neither the Policy nor the SPD defines "accident." (AIG 065-070, 647).  Both the SPD and the Policy exclude certain losses.  The SPD contains a section on "What's Not Covered," which specifies that Voluntary AD&D benefits will not be paid for losses resulting from, e.g., suicide, travel on an aircraft owned by L-3, war, full-time active duty in any armed forces (except the National Guard or organized reserve corps duty), being under the influence of drugs or intoxicants (unless taken under the advice of a doctor), and the insured person's commission of a felony.  (AIG 070).  Similar exclusions are included in the Policy.  (AIG 651).  None of these exclusions is implicated in this case.  No exclusion is expressly provided for losses resulting from medical treatment or surgery.  (AIG 070, 651).

-5-

In contrast, the SPD also included a description of a basic AD&D ("Basic AD&D") plan (AIG 058-059), which specifically excludes injuries resulting from:

> medical or surgical treatment, except when the loss is caused by an infection that results directly from the injury, surgery needed because of the injury, or medical malpractice, and the injury is not otherwise excluded under the [Basic AD&D] Plan.

(AIG 059).  This language apparently provides that losses resulting from medical or surgical treatment are excluded except when they are caused by medical malpractice.

The SPD also provides:

> L-3 . . . , as the Plan Administrator, is responsible for administration of the Plan. . . . The Plan Administrator has the full and complete discretionary authority and responsibility to administer the Plan and may delegate any or all of its authority and responsibility to any individuals or entities by action of its Board of Directors.
>
> The Plan Administrator has delegated to the insurance company the full and complete discretionary authority and responsibility to decide all questions of eligibility for benefits under the Plan.  The insurance company's decisions are final and binding on all persons to the full extent permitted by law.

(AIG 074).

The SPD also explains that:

> In general, ERISA pre-empts state law. However, ERISA does not pre-empt state laws that regulate insurance.  The Plan will always be construed to comply with applicable federal and state law.  In the event there is no controlling federal or state law, the law of the State of New York will apply.

(Id.).

The Policy provides that it "is governed by the laws of the state in which it is delivered." (AIG 645).

3.  **Ms. Barnes's Death**

On February 3, 2007, Ms. Barnes and Barnes met with a consulting physician for pre-operative clearance for elective orthopedic surgery to correct her scoliosis, a congenital condition causing an abnormal curvature of the spine. (AIG 202). The physician's notes indicate that he explained that "scoliosis repair surgery is high risk in general." (Id.). After being advised of the "indications, risks, benefits and alternatives," Ms. Barnes decided to proceed with the surgery, and the physician "cleared" her for surgery from an "internal medicine standpoint." (Id.). She signed several disclosure and consent forms. (AIG 148-160).

On February 8, 2007, Ms. Barnes underwent the surgery. During the surgery, a central venous catheter was improperly placed into her chest, causing massive bleeding and an infusion of fluid into her chest and abdomen.[2] Eventually, the internal bleeding led to cardiopulmonary arrest during her surgery. Her condition thereafter deteriorated and, on February 10, 2007, she died, at the age of thirty-one. (See Pl. 56.1 Statement ¶¶ 10-

---

[2]     A "central venous catheter" is a tube that is placed into a vein for the purpose of giving intravenous fluids and drugs or for withdrawing blood. See Merriam-Webster MedlinePlus Medical Dictionary, http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=central%20line (last visited Jan. 27, 2010) (definition of "central line"); National Cancer Institute, Dictionary of Cancer Terms, http://www.cancer.gov/dictionary/?CdrID=45962 (last visited Jan. 27, 2010) (definition of "central venous access catheter").

13; Def. 56.1 Response ¶¶ 10-13; AIG 005, 016, 025-026, 344-345, 492). She was survived by her husband and three children. (See Pl. Mem. at 3).

The operative reports and autopsy reports provide an explanation of what went wrong. The anesthesiologist inserted the catheter too far, as it "either penetrated the subclavian artery or the ventral surface of the superior vena cava." (AIG 345).[3] The medical examiner later found: "Tip of catheter identified between right subclavical vein and right internal jugular vein and outside of lumens." (AIG 492) (emphasis added). The "lumens" is the cavity of a tubular organ, Webster's Medical Desk Dictionary 396 (1986), and thus the tip of the catheter was not inside the vein, where it was supposed to be. As a consequence, "fluids were profused" into the chest through the "misplaced right subclavian vein catheter." (AIG 492). Indeed, the operative report noted that a "[c]hest x-ray showed a large collection of fluid in the apex of the right chest whose source was unexplained." (AIG 344). The source, of course, was the internal bleeding and the profusion of intravenous fluids from the catheter into the chest cavity. (See AIG 116-117 ("She was taken to a CT scanner, where she was found to have a large hematoma [swelling containing blood] in the right chest thought to be due to vascular disruption [rupturing of the vein] at the time of central venous catheter placement.")).

---

[3]     The "subclavian artery" is a major artery located below the clavicle that supplies blood to the arm and head and the "superior vena cava" is a large vein that returns blood to the heart from the upper half of the body.  Webster's Medical Desk Dictionary 683, 692 (1986).

Both the death certificate and the autopsy report issued in connection with Ms. Barnes's death listed the manner of death as "Accident."  (AIG 476, 492).  The medical examiner concluded:  "I am of the opinion that Trudy Barnes . . . died as a result of a misplaced right subclavian vein catheter during scoliosis surgery through fluids were profused."  (AIG 492).

**4.   The Claim for Benefits**

On or about February 28, 2007, Barnes filed a claim for accidental death insurance benefits for his wife's death under the Policy.  (AIG 474-475; see AIG 473; Pl. 56.1 Statement ¶ 16; Def. 56.1 Response ¶ 16).  AIG denied the claim on September 6, 2007, stating:

> [W]e have determined that we must decline
> payment of this claim as Ms. Barnes'  death
> did not result from bodily injury caused by
> an accident and resulting directly and
> independently of all other causes.  Ms.
> Barnes' death was caused by a complication of
> her surgery due to misplacement of a central
> venous catheter.  This is an accident only
> policy and does not cover sickness or
> disease.  We regret that our decision could
> not be favorable.

(AIG 085, 086).

AIG's decision was based, at least in part, on the report of Dr. Stephen Nash, who conducted an independent peer review at AIG's request.  (AIG 115-118; see AIG 005).  Dr. Nash concluded as follows:

> This young woman unfortunately died as a
> direct result of a complication from her
> surgery.  It is apparent that a central
> venous catheter was improperly placed and she
> subsequently had massive bleeding as well as
> infusion of blood products into her chest

> cavity, eventually leading to cardiopulmonary
> arrest during back surgery. . . .
>
> Fortunately the complications suffered by
> this most unfortunate individual are
> relatively uncommon.  Certainly, the incident
> of central venous catheter placement leading
> to massive quantities of bleeding would be
> quite unusual.  Nevertheless, it clearly
> occurred in this case and the outcome was
> tragic.  While neither frequent nor common,
> this is a known complication of surgery.  In
> addition, this decedent was undergoing an
> extensive operation, which would entail
> significant blood loss . . . and
> complications unfortunately do occur even in
> the best of circumstances.

(AIG 117-118).

On October 5, 2007, Barnes filed an administrative

appeal from the denial of the claim.  (AIG 036-047).  On February

22, 2008, AIG denied the appeal, stating as follows:

> Ms. Barnes . . . died on February 10, 2007
> due to a known complication, although
> relatively uncommon, misplacement of the
> central venous catheter during the surgery.
> Ms. Barnes signed a disclosure and consent
> form prior to her surgery listing numerous
> complications.  This is an accident only
> policy and does not cover sickness or
> disease.

(AIG 016).  AIG concluded that "the claim was correctly denied,"

and advised Barnes of his right to bring a civil action under

ERISA.  (AIG 017).

**B.    Prior Proceedings**

Barnes commenced this action on July 9, 2008, seeking

to recover benefits due under an employee benefits plan -- the

Policy -- pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. §

1132(a)(1)(B).  Barnes sued both AIG and L-3, but discontinued

-10-

the claims against L-3 on August 13, 2008.   These cross-motions
for summary judgment followed.

## DISCUSSION

Before turning to the principal issue presented --
whether Ms. Barnes's death was the result of an accident within
the meaning of the Policy -- I address two threshold issues:   the
standard of review and choice of law.

## A.   Standard of Review

The parties disagree as to the applicable standard of
review.   Barnes argues that de novo review applies, while AIG
argues that its decision may be overturned only if it is
arbitrary and capricious.   I agree that the more deferential
arbitrary and capricious standard governs.

"[A] denial of benefits challenged under §
1132(a)(1)(B) is to be reviewed under a de novo standard unless
the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan."   Kinstler v. First Reliance
Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999) (quoting
Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).
"Where the plan reserves such discretionary authority, denials
are subject to the more deferential arbitrary and capricious
standard, and may be overturned only if the decision is 'without
reason, unsupported by substantial evidence or erroneous as a
matter of law.'"   Id. (quoting Pagan v. NYNEX Pension Plan, 52
F.3d 438, 442 (2d Cir. 1995)).   "Substantial evidence is such

-11-

evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision-maker and] requires more than a scintilla but less than a preponderance." Armstrong v. Liberty Mut. Life Assur. Co. of Boston, 273 F. Supp. 2d 395, 404 (S.D.N.Y. 2003) (quoting Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995)) (internal quotations omitted).

Here, the SPD grants L-3, as plan administrator, "the full and complete discretionary authority and responsibility to administer the Plan." (AIG 074). It also provides that L-3 may delegate any and all of its authority, and it further provides that L-3 "has delegated to the insurance company the full and complete discretionary authority and responsibility to decide all questions of eligibility for benefits under the Plan." (Id.). It further provides that "[t]he insurance company's decisions are final and binding on all persons to the full extent permitted by law." (Id.). As the SPD gives L-3 or its designee -- here AIG -- full discretionary authority to decide "all questions of eligibility for benefits" under the Policy, the more deferential standard of review applies.

Barnes asserts that the New York State Insurance Department has found discretionary clauses in insurance plans to violate New York State law. (Pl. Opp. Mem. at 4). He cites an official "Circular Letter" in which the New York State Insurance Department wrote that discretionary clauses like the one at issue render insurance contracts illusory by essentially nullifying the

-12-

insurer's responsibility to pay.  (Id., Ex. A).  The argument
fails.  Although the Insurance Department has stated its
intention to issue regulations prohibiting the use of
discretionary clauses in insurance policies, it has not done so
yet.  The Second Circuit has held that because any future
regulations would not apply retroactively, the circular letter
has no effect on current claims.  See Krauss v. Oxford Health
Plans, Inc., 517 F.3d 614, 624 (2d Cir. 2008); see also Gannon v.
Aetna Life Ins. Co., No. 05 Civ. 2160 (JGK), 2007 U.S. Dist.
LEXIS 72529, at *19 n.3 (S.D.N.Y. Sep. 28, 2007).

**B.   Choice of Law**

          Although this is an ERISA case, the issue exists as to
what law applies to the questions of contract interpretation.
AIG argues that federal common law applies, relying in part on
Fifth Circuit law.  (Def. Mem. at 8-9, 13).  Barnes denies that
Fifth Circuit law controls, and suggests that New York law
governs.  (Pl. Mem. at 12 n.5).  Ultimately, I need not decide
the choice of law issue, as I do not believe there is any
conflict between state law and federal common law here.

          The Policy provides that it is to be "governed by the
laws of the state in which it is delivered."  (AIG 645).  The
parties agree that the Policy was delivered New York.  (Pl. 56.1
Statement ¶ 2; Def. 56.1 Resp. ¶ 2).  In addition, the SPD
provides that although ERISA generally pre-empts state law, it
does not pre-empt state insurance law, and that New York law will
apply where there is otherwise no controlling federal or state

law. (AIG 074). In this respect, the SPD is consistent with ERISA, which provides that its provisions pre-empt state law except state laws regulating, <u>inter alia</u>, insurance. <u>See</u> 29 U.S.C. § 1144(a), (b)(2)(A); <u>Kentucky Ass'n of Health Plans, Inc. v. Miller</u>, 538 U.S. 329, 334 (2003) (state laws "'specifically directed toward'" insurance industry are not pre-empted by ERISA).

In ERISA cases, courts have generally relied on federal common law to decide whether a loss is "accidental" under an AD&D policy. <u>See, e.g.</u>, <u>Pilot Life Ins. Co. v. Dedeaux</u>, 481 U.S. 41 (1987) (concluding that Congress intended for a federal common law to develop in the ERISA context); <u>Critchlow v. First Unum Life Ins. Co. of Am.</u>, 378 F.3d 246, 255 (2d Cir. 2004) (holding that because ERISA prempts state law as it relates to any ERISA-regulated employee benefit plan, such plans are "to be construed in accordance with federal common law"); <u>see also</u> <u>Stamp v. Metro. Life Ins. Co.</u>, 531 F.3d 84 (1st Cir. 2008) (using federal common law to interpret the term "accident" in AD&D insurance policies); <u>Senkier v. Hartford Life & Accident Ins. Co.</u>, 948 F.2d 1050 (7th Cir. 1991). Even though state law is pre-empted, in developing federal common law, courts may look to state law, at least to the extent state law is not inconsistent with federal law. <u>Critchlow</u>, 378 F.3d at 256; <u>see</u> <u>Senkier</u>, 948 F.2d at 1051 (because no specific provisions of ERISA address the question of what qualifies as an "accident" under AD&D policies, court had "power to formulate federal common law principles").

In ERISA cases in which an insurance contract contained a choice of law provision dictating that state law would govern, courts have held that the choice of law provision controls, unless it would be unreasonable and unfair to apply state law. See, e.g., Buce v. Allianz Life Insurance Co., 247 F.3d 1133, 1149 (11th Cir. 2001) (holding that choice of law clause in ERISA contract should be followed if it is "'not unreasonable or fundamentally unfair.'") (quoting Wang Laboratories, Inc. v. Kagan, 990 F.2d 1126, 1128-29 (9th Cir. 1993)); Tyler v. AIG Life Ins. Co., 273 Fed. Appx. 778, 785 (11th Cir. 2008) (holding, where policy contained choice of law clause calling for application of state law, that state law governs where federal common law and state law conflict).

Here, it would not be unreasonable or unfair to apply the Policy's choice of law clause. Although Barnes lived and worked in Texas and his wife's death occurred in Texas, his employer -- L-3 -- was headquartered in New York and the Policy was issued and delivered in New York. Moreover, the Policy was issued under an employee benefits plan covering many employees, and it would be reasonable, to achieve uniformity and consistency, to apply the law of the state in which the Policy was issued and delivered. Moreover, as AIG issued the Policy, it would not be unreasonable to hold AIG to language that it drafted.

In any event, as both sides seem to acknowledge, there is no real conflict of laws here. (See Def. Mem. at 9; Pl. Mem.

-15-

at 12 n.5).  When it comes to general rules of contract interpretation, there is little difference between federal common law and New York law, for federal common law governing ERISA "embodies common-sense canons of contract interpretation," Brooke v. Home Life Ins. Co., 864 F. Supp. 296, 299 (D. Conn. 1994), and, in developing federal common law, the federal courts may look to state law in any event.  Hence, I will apply both federal common law and New York law in this case.

C.    **The Merits**

I turn to the principal issue presented:  whether Trudy's death was the result of an accident within the meaning of the Policy.  AIG's determination that it was not is to be reviewed under the arbitrary and capricious standard: the determination may be overturned only if it is without reason, it is unsupported by substantial evidence, or it is erroneous as a matter of law.

1.    **Applicable Law**

a.    **Contract Interpretation**

Under New York law, the key to contract interpretation is "the parties' reasonable expectations."  Omni Berkshire Corp. v. Wells Fargo Bank, N.A., 307 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2004) (quoting Sunrise Mall Assocs. v. Import Alley of Sunrise Mall, Inc., 621 N.Y.S.2d 662, 663 (2d Dep't 1995)).  To give effect to the parties' reasonable expectations, the court must "determine the parties' purpose and intent."  Sunrise Mall, 621 N.Y.S.2d at 663; see Bourne v. Walt Disney Co., 68 F.3d 621, 629

-16-

(2d Cir. 1995) (primary objective in contract construction is "to give effect to the intent of the [contracting] parties as revealed by the language they chose to use") (citation omitted). The starting point is the language of the contract or, in the case of insurance contracts, the language of the policy. "Unambiguous provisions of an insurance contract, as with any written contract, must be given their plain and ordinary meaning and the interpretation of such provisions is a question of law for the court." Mazzuoccolo v. Cinelli, 666 N.Y.S.2d 621, 622-23 (1st Dep't 1997) (internal citations omitted); see Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368, 1374 (E.D.N.Y. 1988) ("if the policy is unambiguous, its interpretation is strictly a question of law for the court").

Thus, the threshold question for this Court is whether the Policy is ambiguous. An insurance contract is considered ambiguous where its terms are reasonably susceptible to more than one interpretation. See Andy Warhol Found. for the Visual Arts, Inc. v. Federal Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999); State of New York v. Home Indem. Co., 495 N.Y.S.2d 969, 971 (1985). In contrast, "contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting Breed v. Ins. Co. of N. Am., 413 N.Y.S.2d 352, 355 (1978)). Moreover, "[l]anguage whose

-17-

meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation.  The court is not required to find the language ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning.'"  Hunt, 889 F.2d at 1277 (quoting Bethlehem Steel Co. v. Turner Constr. Co., 161 N.Y.S.2d 90. 93 (1957)).

Where a contract (or an insurance policy) is ambiguous, the Court may look to extrinsic evidence to ascertain the intent of the parties.  See Andy Warhol, 189 F.3d at 215; Lavanant v. Gen. Accident Ins. Co., 584 N.Y.S.2d 744, 747 (1992); Japour v. Ed Ryan & Sons Agency, 625 N.Y.S.2d 750, 751-52 (3d Dep't 1995). To determine intent, the court is to look to the contract as a whole and the parties' conduct, as well as any evidence of surrounding facts and relevant circumstances, industry custom and practice, and course of dealing.  Bourne v. Walt Disney Co., 68 F.3d at 627-29; U.S. Naval Inst. v. Charter Commc'ns, Inc., 875 F.2d 1044, 1048-49 (2d Cir. 1989) (citing New York cases).

Ambiguities in the language of an insurance policy that is part of an ERISA plan "are to be construed against the insurer."  Critchlow, 378 F.3d at 256.  In particular, exclusions from coverage are to be narrowly construed and must be specific and clear, although it is the insured's burden to prove that a loss is covered by the policy.  Id.

Summary judgment "is clearly permissible when the language of the contract provision in question is unambiguous."

Nycal Corp. v. Inoco PLC, 988 F. Supp. 296, 298 (S.D.N.Y. 1997)
(citing inter alia Mellon Bank, N.A. v. United Bank Corp. of
N.Y., 31 F.3d 113, 115 (2d Cir. 1994)). Summary judgment is also
appropriate, however, "when the language is ambiguous and there
is relevant extrinsic evidence, but the extrinsic evidence
creates no genuine issue of material fact and permits
interpretation of the agreement as a matter of law." Nycal
Corp., 988 F. Supp. at 299; see also Chock Full O'Nuts Corp. v.
Tetley, Inc., 152 F.3d 202, 204 (2d Cir. 1998) (holding that
"notwithstanding the existence of contractual ambiguities,
summary judgment may be granted if . . . [the non-movant fails]
to show that there is any issue of material fact for trial;
however the ambiguity were resolved, the movant would prevail").

> **b.   What is an "Accident?"**

The meaning of the term "accident" in the context of
AD&D plans has been the subject of litigation in New York for
many years.  New York courts have held that the term "accident"
is to be considered objectively and given the meaning ascribed to
it by "the average man"; it is "to be construed and considered
according to the ordinary understanding and common usage and
speech of people generally."  Regan v. Nat'l Postal Transp.
Ass'n, 280 N.Y.S.2d 319, 329 (Civ. Ct. 1967) (citing Berkowitz v.
New York Life Ins. Co., 10 N.Y.S.2d 106, 109 (1st Dep't 1939)).
Federal common law is to the same effect.  Critchlow, 378 F.3d at
256 ("'We interpret ERISA plans in an ordinary and popular sense
as would a person of average intelligence and experience.'")

-19-

(applying federal common law and quoting <u>Todd v. AIG Life Ins.</u> <u>Co.</u>, 47 F.3d 1448, 1452 n.1 (5th Cir. 1995)).  At the same time, there is a subjective element:  "'in construing whether or not a certain result is accidental, it is customary to look at the casualty from the point of view of the insured, to see whether or not, from his point of view, it was unexpected, unusual and unforeseen.'"  <u>Miller</u>, 389 N.Y.S.2d 565, 566 (1975) (quoting 1A John Alan Appleman, <u>Insurance Law & Practice</u> § 391 (1972)); <u>accord</u> <u>Critchlow</u>, 378 F.3d at 257-60.

New York courts have construed the term "accident" broadly.  <u>See, e.g.</u>, <u>Burr v. Comm. Travelers Mut. Acc. Ass'n</u>, 295 N.Y. 294, 67 N.E.2d 248 (1946) (death was accidental when decedent slipped and fell while shoveling snow and died moments later); <u>Mansbacher v. Prudential Ins. Co. of Am.</u>, 273 N.Y. 140, 7 N.E.2d 18 (1937) (death was accidental when decedent unintentionally took an excessive dosage of prescription sleep aid); <u>Lewis v. Ocean Acc. & Guar. Corp.</u>, 224 N.Y. 18, 120 N.E. 56 (1918) (death caused by infection introduced when puncturing a pimple on the decedent's lip was accidental).  Articulations of the definition vary, but most courts arrive at some variation of the following:

> The word "'accident' normally designates an
> unforeseen occurrence, usually of untoward or
> disastrous character, or an undesigned sudden
> or unexpected event of an inflictive or
> unfortunate character. . . .  The natural and
> ordinary consequences of an act do not
> constitute an 'accident.'"

<u>Howard v. Nat'l Educ. Ass'n of N.Y.</u>, 984 F. Supp. 103 (N.D.N.Y.

1997) (quoting <u>Haley v. Am. Int'l Life Assurance Co. of N.Y.</u>, 789 F. Supp. 260, 263 (N.D. Ill. 1992) (citations omitted)); <u>see also</u> <u>Northville Indus. Corp. v. Nat'l Union Fire Ins. Co.</u>, 657 N.Y.S.2d 564 (1997) ("the term 'accidental' includes not only an unintended event but also one 'occurring <u>unexpectedly</u> or by chance'"(quoting <u>Webster's 9th New Collegiate Dictionary</u> 49)); <u>First Investors Corp. v. Liberty Mutual Ins. Co.</u>, 152 F.3d 162, 166 (2d Cir. 1998) (accidents are "unintended" events, including those occurring "unexpectedly or by chance," as well as "sudden and instant" happening assignable to "something catastrophic or extraordinary") (citations and internal quotation marks omitted); <u>Cronin v. Zurich American Ins. Co.</u>, 189 F. Supp. 2d 29, 37 n.5 (S.D.N.Y. 2002).

In cases involving a death in connection with medical or surgical treatment, there is no hard and fast rule, as some courts have held that the death was accidental,[4] while other

---

[4]     <u>See, e.g.</u>, <u>Adlerblum v. Metro. Life Ins. Co.</u>, 19 N.Y.S.2d 600 (1st Dep't 1940) (death ruled accidental when caused by an unknown hypersensitivity to novocaine, which had been injected into the decedent in preparation for surgery); <u>Berkowitz v. New York Life Ins. Co.</u>, 10 N.Y.S.2d 106 (1st Dep't 1939) (death was accidental when caused by unknown allergy to prescription drug); <u>Aetna Life Ins. Co. v. Brand</u>, 265 Fed. 6 (2d Cir. 1920) (injury was accidental where, in sewing up incision following hernia operation, surgeon's needle pricked artery, gangrene resulted, and leg had to be amputated); <u>see also</u> <u>Whetsel v. Mutual Life Ins. Co. of N.Y.</u>, 669 F.2d 955 (4th Cir. 1982) (injury occurring during medical treatment is an accident for insurance purposes); <u>Sellers v. Zurich Amer. Ins. Co.</u>, 2009 WL 1351157 (E.D. Wis. May 13, 2009) (medical malpractice is an accident); <u>Smith v. Continental Casualty Co.</u>, 616 F. Supp. 2d 1286 (N.D. Ga. 2007) (misplacement of surgical screw is an accident); <u>Clark v. Metro. Life</u>, 369 F. Supp. 2d 770 (E.D. Va. 2005) (injury resulting from medical malpractice is an accident); <u>Borrelli v. Unumprovident Corp.</u>, No. 01-6938, 2002 WL 31319476

courts have held that the death was not accidental.[5]

## 2.   Application

I conclude that Ms. Barnes's death was the result of an accident within the meaning of the Policy and that AIG's determination to the contrary was arbitrary and capricious.

### a.   Was Ms. Barnes's Death the Result of an Accident?

First, I consider the words of the Policy.  By its terms, the Policy provides "accident insurance" and is an "accident only policy" that "does not cover sickness or disease." (AIG 645).  It covers bodily injury and death "caused by an accident . . . and resulting directly and independently of all other causes."  (AIG 647; see AIG 649).  The Policy does not define the term "accident."  It contains, in addition to the statement on the cover that it does not cover "sickness or disease," six exclusions.  (AIG 651).  No exclusion is provided

_____

(N.D. Ill. 2002) (absent policy language to contrary, death from malpractice is an accident).

[5]      See, e.g., Bracey v. Metro. Life Ins. Co., 282 N.Y.S.2d 121, 123 (2d Dep't 1967) ("[I]f death occurs as a result of surgery and not by reason of the intervention of some outside agency, the result, in the eyes of the law, is not 'accidental.'"); Rosenthal v. Mutual Life Ins. Co., 155 N.Y.S.2d 478 (Sup. Ct. 1956) (death resulting from postoperative complications after a gall bladder operation not an accident), rev'd, 181 N.Y.S.2d 549 (1st Dep't 1959), rev'd, 207 N.Y.S.2d 450 (1960) (reinstating trial court's judgment); Bennett v. Equitable Life Assurance Soc. of U.S., 13 N.Y.S.2d 540 (1st Dep't 1939) (death due to postoperative pulmonary embolism not accidental); see also Thomas v. AIG Life Ins., 244 F.3d 368 (5th Cir. 2001) (medical malpractice not an accident); Senkier, 948 F.2d 1050 (7th Cir. 1991) (death resulting from a venous catheter that pierced decedent's heart not an accident); Preferred Accident Ins. Co. v. Clark, 144 F.2d 165 (10th Cir. 1944) (death resulting from pulmonary collapse after gall bladder operation not accidental).

for injury (or death) resulting from medical or surgical treatment or medical malpractice.  If AIG had wanted to exclude losses resulting from medical or surgical treatment, it could have included such an exclusion.  It did not.  Indeed, as shown by the SPD, such an exclusion existed in the Basic AD&D policy. (AIG 059).

Ultimately, the Policy is ambiguous, as it does not define the term "accident."  See, e.g., Omni Berkshire, 307 F. Supp. 2d at 540 (holding agreement ambiguous because it leaves key terms undefined); Uniroyal, 707 F. Supp. at 1382-83 (differing terms of definition of "occurrence" render term ambiguous).  The word "accident" simply does not have a definite and precise meaning, as shown by the extent to which courts have struggled over the years to interpret the word in the context of accident insurance policies.  See, e.g., Brenneman v. St. Paul Fire and Marine Ins. Co., 192 A.2d 745, 747 (Pa. 1963) ("What is an accident?  Everyone knows what an accident is until the word comes up in court."); Miller v. Cont'l Ins. Co., 389 N.Y.S.2d 565, 566 (1976) ("The multifaceted term 'accident' is not given a narrow, technical definition by the law.").  Nor does the Policy define the term "sickness or disease" nor does it exclude or even reference losses resulting from medical or surgical treatment or medical malpractice.  Consequently, I may look to extrinsic evidence to determine the intent of the parties and to give effect to their reasonable expectations.

Second, I consider the words of the SPD.  Like the Policy, it does not define "accident" and makes no reference to

-23-

"medical or surgical treatment" or "medical malpractice."  Unlike
the Policy, it does not state that the Policy does not cover
"sickness or disease."[6]  It does seem to tout broad protection:
"Voluntary AD&D Insurance is in effect 24 hours a day.  It is
worldwide protection that applies to accidents on and off the
job, at home or away from home."  (AIG 065).  The SPD sets forth
the same six exclusions set forth in the Policy; no exclusion is
set forth for losses resulting from medical or surgical
treatment.  (AIG 070).

Taking the words of the Policy and SPD together, I
conclude that a reasonable employee of L-3 who purchased
Voluntary AD&D would have expected broad -- indeed 24-hour
"worldwide" -- protection in the event of accidental injury,
whether on or off the job, whether at home or away.  The

---

[6]      If a summary plan description and a policy covered by
ERISA conflict, the summary plan description controls.  See Burke
v. Kodak Ret. Income Plan, 336 F.3d 103, 110 (2d Cir. 2003)
(citing Heidgerd v. Olin Corp., 906 F.2d 903, 907-08 (2d Cir.
1990)) (stating that because the SPD is an employee's primary
source of information regarding the insurance plan, he or she is
entitled to rely on its content).  If an summary plan description
is silent about a matter addressed in a related policy, the
circuits are split as to whether a conflict exists.  The majority
of circuits have held that no conflict exists, see, e.g., Koons
v. Aventis Pharms., Inc., 367 F.3d 768, 775 (8th Cir. 2004); Mers
v. Marriott Int'l Group Acc. Death and Dismemberment Plan, 144
F.3d 1014 (7th Cir. 1998), but the Second Circuit has held that
silence in a summary description plan regarding an issue
described in a related insurance policy creates a conflict
between the two documents.  See Burke, 336 F.3d at 111 (citing
Heidgerd, 906 F.2d at 908) (holding that because summary plan
description omitted an affidavit requirement listed in policy,
the two conflict and summary plan description controls); Layaou
v. Xerox Corp., 330 F. Supp. 2d 297 (W.D.N.Y. 2004).  Although
the issue is not free from doubt, I assume that no conflict
exists here, as an accident-only policy would not cover, as a
general matter, sickness or disease.

reasonable employee would not have been alerted to any exclusion for losses resulting from medical or surgical treatment.  Indeed, a reasonable employee reading the SPD would have seen that there was an exclusion for medical or surgical treatment for Basic AD&D but not for Voluntary AD&D.  Finally, given the absence of a definition of "accident," the reasonable employee would have undoubtedly concluded that the word "accident" was to be given its ordinary, everyday meaning.

Third, I reject AIG's implicit suggestion that injury resulting from medical malpractice cannot be accidental as a general matter.  I reject the notion that there is a blanket rule that medical malpractice is -- or is not -- an accident.  Indeed, as discussed above, the cases go both ways, and in certain circumstances acts that constitute medical malpractice will fit within the definition of "accident" and in other circumstances they will not.  There has to be case-by-case review.[7]

Fourth, here, giving the word "accident" its ordinary, everyday meaning, I conclude, as a matter of law based on the undisputed facts, that Ms. Barnes's death was the result of an accident and not sickness or disease.  She did not die of scoliosis.  She did not die from the elective surgery to correct back pain.  She did not die because of the extensive bleeding usually associated with surgery of this sort.  She was not

---

[7]     Significantly, the Basic AD&D policy set forth an exception, in the medical or surgical treatment exclusion, for medical malpractice -- an indication that the drafter of that policy believed losses from medical practice were not accidental in nature.

suffering from any life-threatening sickness or disease.  Rather, she died as the result of the "misplacement" of a catheter into her chest by the anesthesiologist, which resulted in the rupturing of a vein and the tip of the catheter being left outside the "lumens."  As a consequence, fluids profused into the chest cavity.  There was massive bleeding and the chest and abdomen filled with blood and fluids that should not have been there.  Ultimately, Ms. Barnes went into cardiopulmonary arrest, dying two days later.

Objectively and subjectively, this was an unintended, unexpected, unusual, unforeseen, and unfortunate -- indeed, tragic -- event.  It was sudden, catastrophic, extraordinary, and disastrous.  Indeed, the physician hired by AIG to conduct an independent peer review characterized the complications as "relatively uncommon," Ms. Barnes as a "most unfortunate individual," and the "incident" as "quite unusual."  (AIG 117-118).  These are all earmarks of an accident.  Indeed, both the autopsy report and the death certificate classify the death as accidental.  While these are not binding, they do support the notion that the death was the result of an accident within the normal, everyday meaning of the word.  See, e.g., Randazzo v. Barnhart, 332 F. Supp. 2d 517, 524 (E.D.N.Y. 2004); Regan v. Nat'l Postal Transp. Ass'n, 280 N.Y.S.2d 319, 324-26 (N.Y.C. Civil Ct. 1967).

Finally, to the extent there is any doubt, ambiguities in an insurance policy, particularly one regulated by ERISA, are

to be construed against the insurer.  In view of the lack of a definition in the Policy (or the SPD) for the term "accident," the absence of an exclusion for "medical or surgical treatment" in the Policy and the section of the SPD covering Voluntary AD&D, the inclusion of such an exclusion in the SPD for Basic AD&D, the broad language in the SPD describing Voluntary AD&D coverage, and the facts and circumstances surrounding Ms. Barnes's death, the ambiguity in the language of the Policy must be construed against AIG and in favor of Barnes.

AIG makes some additional arguments that warrant brief discussion.  First, AIG argues that Ms. Barnes was repeatedly informed by physicians that "death or serious complications" could result from "this high-risk back surgery," and that she "had a reasonable expectation of the possibility of death from this surgery."  (Def. Mem. at 10).  The notion is absurd.  If Ms. Barnes had reasonably expected that she would die, as the thirty-one year old mother of three young children (see Pl. Mem. at 3), she never would have proceeded with this elective back surgery. The inquiry is whether there was an expectation of death, not, as AIG argues, an expectation of the possibility of death.  See Critchlow, 378 F.2d at 257.[8]  Ms. Barnes was aware of the risk of complications and the risk that the surgery would not improve her

---

[8]     In Critchlow, the insured died from "autoerotic asphyxiation, i.e., the practice of limiting the flow of oxygen to the brain during masturbation in an effort to heighten sexual pleasure."  378 F.3d at 250.  Even though the insured choked himself intentionally, the Second Circuit determined that the insured's death "was subjectively unintended and that he subjectively expected to survive."  Id. at 259-60.

scoliosis, but she surely did not expect that she would be subjected to gross medical malpractice by an anesthesiologist, to such an extent that she would die.

Second, AIG argues that because Ms. Barnes died from a known, foreseeable complication of surgery, this could not have been an accidental death. (Def. Mem. at 10-14). It contends that "medical malpractice is reasonably anticipated as a part of standard medical treatment and does not constitute an 'accident' that would be covered under an accidental death policy." (Id. at 14). This is simply too broad a statement. If an event fits within the ordinary, common understanding of what an "accident" is, it is covered by an accidental death policy, even if it is foreseeable. It is foreseeable, for example, that cars will crash and that people will trip and fall in supermarkets, and yet when these events occur and someone is injured, they are considered accidents, for they are still unexpected and unintended. If an insurance company wants to carve losses from medical and surgical treatment out of the definition of an "accident," it can do so with an exclusion, as was done with the Basic AD&D, as described in the SPD. Moreover, although every surgery will be accompanied by risk of complication, what happened here was far more than a "complication."

Finally, AIG relies heavily on Judge Posner's decision in Senkier v. Hartford Life & Accident Ins. Co., 948 F.2d 1050 (7th Cir. 1991). This reliance is understandable, as there are similarities. The insured suffered from Crohn's Disease and was

-28-

hospitalized with a tentative diagnosis of intestinal obstruction. Id. at 1051. A catheter was inserted into a vein beneath her clavicle for administering nourishment intravenously. Several days later, she died suddenly because the catheter had become detached and entered the heart through a vein, puncturing the heart. The preliminary death certificate listed the puncture as the cause of death, but the final certificate listed nutritional deficiency from Crohn's disease as the cause of death. Id. The court concluded an accidental death insurance policy does not cover "injuries resulting from medical treatment." Id. The court wrote:

> Any time one undergoes a medical procedure there is a risk that the procedure will inflict an injury, illustrating the adage that "the cure is worse than the disease." The surgeon might nick an artery; might in fusing two vertebrae to correct a disk problem cause paraplegia; might in removing a tumor from the patient's neck sever a nerve, so that the patient might never hold his head upright again. A simple injection will, in a tiny fraction of cases, induce paralysis. An injection of penicillin could kill a person allergic to the drug. A blood transfusion can infect a patient with hepatitis or AIDS. All these injuries are accidental in the sense of unintended and infrequent. But they are not "accidents" as the term is used in insurance policies for accidental injuries. The term is used to carve out physical injuries not caused by illness from those that are so caused, and while injuries caused not by the illness itself but by the treatment of the illness could be put in either bin, the normal understanding is that they belong with illness, not with accident.

Id. at 1051-52.

Senkier does not require a different result in this case. First, the decision is not, of course, controlling, and in

-29-

fact courts in New York and the Second Circuit have found that some of the specific examples cited in <u>Senkier</u> were accidents. <u>See</u> <u>supra</u> footnote 4. Second, the policy in <u>Senkier</u> expressly excluded, in addition to "sickness or disease," "medical or surgical treatment of a sickness or disease." 948 F.2d at 1051. The language shows that if an insurer wants to exclude losses from "medical or surgical treatment," it knows how to do so. Here, no such language was included in the Policy.

Third, the facts of <u>Senkier</u> are simply different: the insured was suffering from Crohn's disease and an intestinal obstruction; she was unable to eat and thus a catheter had to be inserted to administer nourishment intravenously; the catheter was apparently properly placed, but came loose after several days; tragically, it punctured the heart, but it was unclear from the record whether the insured died from Crohn's disease or from the "migrating catheter." <u>Id.</u> at 1051, 1053. It was clear that a "standard complication" of this procedure was that the catheter may become detached and embolize into the heart, and thus, the court concluded, the death resulted not from an accident but from the illness. <u>Id.</u> at 1053.

In contrast, here, Ms. Barnes died not from illness or scoliosis or a back ailment or a catheter coming loose, but from an anesthesiologist's gross malpractice in the initial insertion of the catheter, puncturing a vein, and causing bleeding and allowing the catheter to profuse fluids into the chest cavity. The doctors then failed to notice the problem until it was too late. This was not a "standard complication" by any means.

-30-

Finally, the <u>Senkier</u> court's decision was largely policy-based, as the court was concerned about the burdens that would arise from the litigation of these difficult cases. <u>Id.</u> at 1053-54. While these are fair concerns, the answer is that insurers can write their policies in such a manner as to exclude (or not cover) losses resulting from medical or surgical treatment.

I conclude that Ms. Barnes's death was the result of an accident within the meaning of the Policy.

### b.   <u>Was AIG's Decision Arbitrary and Capricious?</u>

The issue remains whether AIG's decision to deny Barnes's claim was arbitrary and capricious. I conclude that it was.

AIG's decision is based largely on the generalization that medical malpractice is not accidental in nature. This reasoning is quintessentially arbitrary, as it ignores the particular facts and circumstances surrounding Ms. Barnes's death and rests on a generalization. It is also erroneous as a matter of law, as there are many cases that have held acts of malpractice to be accidents.

Finally, the decision is not supported by substantial evidence, as the language of the Policy and SPD, the facts surrounding Ms. Barnes's death, and the ordinary, everyday understanding of the term "accident" all compel the conclusion that the claim was wrongly denied.[9]

---

[9]   In light of my coverage ruling, I do not reach two matters. First, I need not decide whether a conflict of interest

-31-

**CONCLUSION**

For the reasons set forth above, Barnes's motion for summary judgment is granted and AIG's motion is denied.   Judgment will be entered in favor of Barnes against AIG for the relief requested in the complaint, including pre-judgment interest, attorneys' fees, and costs.   Barnes shall submit a proposed judgment together with an application for attorneys' fees and costs by February 11, 2010.   AIG shall submit its objections and opposition, if any, by February 20, 2010.

SO ORDERED.

Dated:      New York, New York
            February 4, 2010

                                    DENNY CHIN
                                    United States District Judge

---

existed because AIG was both plan administrator and the payor of benefits, see Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2346 (2008) ("a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits"), as I conclude that AIG's decision was arbitrary and capricious irrespective of any conflict of interest.   Second, I need not consider Barnes's alternative claim that the SPD was deficient as a matter of law.   See 29 U.S.C. § 1022(b); Tocker v. Philip Morris Cos., 470 F.3d 481, 488 (2d Cir. 2006).